UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

FAIR HOUSING CENTER OF
SOUTHEAST & MID MICHIGAN,

                    Plaintiff,                      Case No. 1:20-cv-_____

vs.

                                                **COMPLAINT**

ERIE INVESTMENTS NO. 15, LLC, a
Domestic Limited Liability Company,
and MIKE O'LYNNGER,
an individual,

                    Defendants.

---

William F. Piper (P38636)
William F. Piper, P.L.C.
Attorney for Plaintiff
1611 West Centre Avenue, Suite 209
Portage, MI 49024
Phone: 269.321.5008
Fax: 269.321.5009

---

       The plaintiff by and through its attorney William F. Piper, PLC., for its complaint, states as follows:

## JURISDICTIONAL ALLEGATIONS

       1.     The plaintiff is a nonprofit corporation that does business in the County of Washtenaw, State of Michigan.

       2.     This court has the authority to grant declaratory and injunctive relief under Fed. R. Civ. P. 57 and under 28 U.S.C. §2201 and 28 U.S.C. §2202.

3.      This matter arose in the City of Ypsilanti, County of Washtenaw, at the Red Lion Apartments, which the defendants own and operate, upon information and belief, as they apply their no criminal record policy, regarding tenants there.

4.      This matter arises under the Fair Housing Act of 1963, as amended, 42 U.S.C. §3601 et. seq.

5.      Certain claims in this action arise under this court's supplemental jurisdiction to hear and decide claims arising out of the same transactions and occurrences as the federal law claims.

## COMMON ALLEGATIONS

6.      The plaintiff restates and realleges as though fully set forth herein paragraphs 1 – 5 of this complaint.

7.      The defendants have, at least since October 2018, had a policy or practice or both of automatically excluding any prospective tenant for renting an apartment within the Red Lion Apartments in Ypsilanti if a felony appears on the prospective tenant's background check.

8.      This policy or practice of the defendant of automatically excluding an person with a felony conviction for a tenancy is absolute and does not permit exceptions, regardless of the nature of the felony conviction, the age of it, any evidence of rehabilitation or any other factor bearing upon whether the person is a threat to safety or property or has the ability to pay.

9.      As a result of the aforementioned policy or practice, prospective applicants for a tenancy at the Red Lion Apartments are either deterred from applying for a tenancy or automatically denied after spending money on an application for it.

10.     Since 1980, the number of persons in incarcerated in the United States has grown from 300,000 to more than 2.3 million today.

2

11.     At the same time as the sheer numbers of people with criminal convictions has substantially increased, it has become much easier for housing providers to identify and ban people from housing because of criminal convictions because of the digitalization of records and the growth of private companies that provide in inexpensive background checks on prospective tenants.

12.     The massive increase of incarceration and the number of people with criminal records has had an unequal and disparate impact on African-Americans.

13.     African-Americans are incarcerated at rates that are disproportionate to the numbers in the United States' general population.   African-Americans, in 2018, comprise 37.6% of all prisoners, but only 13.4% of the United States' population.

14.     According to the Sentencing Project, the white imprisonment rate for the State of Michigan was 253 per 100,000 in 2014, while the corresponding rate for African-Americans was 1,682 per 100,000.

15.     That African-Americans are far more likely than whites to have a felony criminal record means that African-Americans are much more likely than whites to be excluded from housing by an automatic exclusion of people with felony records.

16.     This fact also applies to Washtenaw County.   A study conducted by former Washtenaw Circuit Court Judge Donald Shelton of persons convicted of felonies in Washtenaw County from 1990 through 2007 revealed that although only 12.8% of the population of Washtenaw County were African-American, 49.5% of the defendants in the study were African-American, and 53.4% of the sentencings were of African-Americans.[1] There is no reason to think that there is any major changes in this today.

---

[1] Shelton, Donald E., "A database of persons convicted of felonies in Washtenaw County, Michigan," (2007). Masters Thesis and Doctoral Dissertations. 235

17.    In April 2016, the U.S. Department of Housing and Urban Development ("HUD") issued interpretive guidance confirming that automatic bans, like the Defendants' Criminal Records Policy, have a disproportionate adverse effect on African-Americans because of disparities in the criminal justice system; moreover, HUD's guidance cautioned that automatic bans, which categorically exclude applicants because of their criminal history, are *never* necessary to achieve the potentially legitimate interest of protecting safety or property. See Exhibit B (HUD, *Office of Gen. Counsel Guidance on Application of FHA Standards to the Use of Criminal Records by Providers of Hous. and Real Estate-Related Transactions*) ("HUD Guidance") (Apr. 4, 2016) at 2-7. The HUD Guidance further explains that this applies to automatic bans based either on arrests or convictions. *Id.* [2]

18.    Studies have shown that although African-Americans and whites use illegal drugs at the same general rate, African-Americans are systematically more likely to be arrested and prosecuted for such use. Given the "war on drugs", this has resulted in disproportionate conviction rates of African-Americans for illegal drug offenses relative to whites.

19.    The Equal Employment Opportunity Commission's ("EEOC") analysis of the impact of automatic criminal history bans in the employment context further confirms the disparate impact described here. The EEOC analyzed national criminal records data and concluded that automatic criminal history bans have a disparate impact on the basis of race, and it documented its findings in its Enforcement Guidance on the Consideration of Arrest and Conviction Records in

---

[2] The HUD Guidance explains the appropriate analysis in detail but does not change the law; automatic bans violate the Fair Housing Act independent of the Guidance. See *Jackson v. Tyron Park Apartments, Inc.*, No. 6:18-CV-06238 EAW, 2019 WL 331635, at *3-5(W.D.N.Y. Jan. 25, 2019).

Employment Decisions Under Title VI of the Civil Rights Act of 1964 ("Enforcement Guidance").[3]

20.    The EEOC's conclusion applies to the disparate impact analysis here because categorical criminal records bans operate the same way in housing as they do in employment.  In both contexts, applicants are informally and permanently excluded, whether from housing opportunities or employment, before due consideration of the merits or qualifications of the applicant for housing or a job in question and without any individualized assessment of whether their criminal history makes them personally unqualified.  They are excluded based solely on the fact of a prior conviction or even a pending criminal charge, regardless of whether they pose a current risk.

21.    African-Americans seeking to rent an apartment unit at Red Lion Apartments are substantially more likely than whites to be harmed by the defendants blanket No Felony Conviction policy irrespective of the exact boundaries of the rental market.

22.    The defendant's refusal to provide housing to people with felony convictions directly causes a racially disparate, adverse impact on African-Americans.

23.    Extensive research establishes that protecting safety and property does not justify a blanket criminal records policy.  The research shows that additional factors, such as the amount of time since the last offense, the person's age, and the type of conviction, must be considered to assess whether a past criminal conviction suggests a risk of future criminal conduct.

24.    The amount of time since the last offense is a critical factor in making this assessment.  Studies show that in seven years or even fewer, the risk of future arrest for somebody

---

[3] 2012 WL 1499883 (Apr. 25, 2012).  The prior versions from 1987 and 1990 reached the same conclusion and set forth the same presumption.

with a past conviction becomes no greater than the risk for somebody without a past conviction.[4] One more recent study found that negative outcomes in rental housing specifically are no more likely once a felony conviction is five years old and once a misdemeanor conviction is just two years old. [5]

25.     The rental housing study also demonstrated that the type of conviction is important in predicting whether a person's criminal record indicates a heightened risk. [6] It found that for 11 out of 15 categories of crime studied there is no statistically meaningful increase in negative outcomes for renters with a past conviction in comparison to renters without a criminal history. These 11 categories include minor drug offenses, prostitution, alcohol-related offenses, and minor public disorder offenses. The increase in the other four categories is small, and, as explained above, disappears over time.

26.     Studies show that a person's age and frequency of past criminal activity are also key factors in determining whether the individual poses any risk to safety or property. [7] People with a criminal record who are older, and those with fewer criminal offenses, are much less likely to engage in future criminal conduct or pose a threat to the community.

27.     Accordingly, concerns about safety and the protection of the property do not provide a substantial and legitimate rationale for a broad blanket ban on eligibility like the defendants' No Felony Conviction" policy.

---

[4] Megan C. Kurlychek et al., *Scarlet Letters and Recidivism: Does an Old Criminal Record Predict Future Offending?* 5 Criminology and Pub. Pol'y 483 (2006). *See also* Alfred Blumstein and Kiminori Nakamura, *Redemption in the Presence of Widespread Criminal Background Checks*, 47 Criminology 327 (2009)
[5] Cael Warren, Success in Housing: How Much Does Criminal Background Matter?, Wilder Research (2019), https://www.wilder.org/sites/default/files/imports/AEON_HousingSuccess_CriminalBackground_Report_1-19.pdf.

[6] *See id.*
[7] *See* Shawn Bushway et al., *The Predictive Value of Criminal Background Checks: Do Age and Criminal History Affect Time to Redemption?*, 14 Criminology 27, 52 (2011).

28.     Giving individualized consideration to each potential resident's circumstances is a less discriminatory alternative to a No Felony Conviction policy and would address any substantial, legitimate, nondiscriminatory justification for the policy.

29.     Specifically, to the extent that public safety or protection of property at Red Lion Apartments is a valid justification, this can be accomplished through the use of individual assessments that consider the nature of an individual's conviction, the amount of time since the conviction or release, and the evidence of rehabilitation, among other factors.  An individualized assessment allows people with a criminal record, but who pose no realistic current or future threat to the community, to obtain housing.  This more tailored approach both protects public safety and property and is less discriminatory and exclusionary because it reduces the number of African-American applicants who are categorically banned from the Red Lion Apartments.

30.     The HUD Guidance Expressly calls for the use of individualized consideration as a less discriminatory alternative to an automatic exclusion on the basis of criminal history, through consideration of factors such as "the facts or circumstances surrounding the criminal conduct; the age of the individual at the time of the conduct; evidence that the individual has maintained a good tenant history before and/or after the conviction or conduct; and evidence of rehabilitation efforts."[8]

31.     In the analogous employment context, the EEOC recognizes that individualized assessments are almost always required by law because they provide a less discriminatory alternative to automatic criminal history bans and are sufficient to protect legitimate interests, including safety.  Specifically, the EEOC Enforcement Guidance advocates the use of "a targeted screening considering at least the nature of the crime, the time elapsed, and the nature of the job."[9]

---

[8] *See* HUD Guidance at 7.
[9] Enforcement Guidance at 14.

This screening should include "notice to the individual that he has been screened out because of a criminal conviction; an opportunity for the individual to demonstrate that the exclusion should not be applied due to his particular circumstances; and consideration by the employer as to whether the additional information provided by the individual warrants and exception to the exclusion and shows that the policy as applied is not job related and consistent with business necessity".[10]

32.   The defendants' overly broad ban against renting to persons who have felony convictions prevents any individualized consideration.  Because the defendants would not have to compromise any legitimate concerns that they may have by giving individualized consideration to applicants' particular circumstances and allow those individuals whose tenancy would not threaten public safety or a property interest to live at Red Lion Apartments, the defendants' policy of automatically excluding people with felony convictions is not necessary to achieve a substantial and legitimate business interest.

33.   Several factors strongly indicate that the real reason the defendants adopted the No Felony Conviction policy was not to protect safety or property, or for any other substantial and legitimate reason, but to reduce the number of African-American people who are eligible to become tenants.  Specifically, the defendants' decision to maintain a far-reaching No Felony Conviction policy, despite the housing industry's rejection of such policies precisely because  of their discriminatory impact, suggests that this policy was intended to limit the number of African-Americans living at the Red Lion Apartments.  Any such purported justification is actually a pretext for intentional racial discrimination.

34.   Intentional discrimination may be inferred from a number of factors, including whether the challenged action weighs more heavily on one group than another, whether there have

---

[10] *Id.*

8

ben changes in normal procedures, and whether there have been substantive departures from usual practices. [11]

35.     The statistical disparities here are extraordinary.  That is, the difference in the rates at which prospective African-American tenants are adversely affected by the policy is dramatically larger than the rate at which prospective white tenants are affected.  This is not a situation where a facially neutral policy harms minorities 10% or 20% more frequently than it harms non-minorities.  Rather, as shown above, otherwise-qualified African-Americans are at least more than four times more likely that whites to be barred from Red Lion Apartments because the defendants' No Felony Conviction policy.  Moreover, these dramatic disparities are entirely foreseeable because of well-known disparities in the criminal justice system.  As the Supreme court has explained, large statistical disparities are "often a telltale sign of purposeful discrimination[.]"[12]

36.     The HUD Guidance was released over three years ago, in April of 2016, and it has been well-publicized to housing providers.  Major industry organizations including the National Multifamily Housing Council, the National Apartment Association, and the National Association of Realtors, as well as  local organizations, all disseminated information about the HUD Guidance and emphasized the importance of dispensing with automatic criminal history bans.[13]

37.     The Guidance is not ambiguous; it clearly explains how broad-based criminal background policies that rely on criminal histories cause a disparate impact on people of color,

---

[11] *Vill. Of Arlington Heights v Metro. Dev. Corp.*, 429 U.S. 252(1977)
[12] *Int'l Bhd. of Teamsters v United States*, 431 U.S. 324, 339 n.20(1977).
[13]     Nat'l multifamily Hous. Council, *Criminal Conviction Screening Policie*s (June 23, 2016), http://www.nmhc.org/uploandedFiles/News/NMHC_News/Criminal%20Copnviction%20Screening%20Poloicies%20_NMHC-NAA_062316%20webinar.pdf; Nat'l Apartment Ass'n, *Fed Officials Warn Against Blanket Criminal History Exclusions* (April 25, 2016).  https://www.naahq.org/news-publications/fed-officials-warn-against-blanket-criminal-history-exclusions; Nat'l Ass'n of Realtors, *What the Latest Fair Housing Guidance on Criminal Background Checks Means for Real Estate* (May 13, 2016), https://nar.reltor/newsroom/what-the-latest-fair-housing-guidance-on-criminal-background-checks-means-for-real-estate;  Va. Ass'n of Realtors, *Criminal Background Checks Under the Fair Housing Act* (Nov. 15, 2017

how automatic blanket bans that categorically exclude applicants as a result of their criminal history are not necessary to satisfy a legitimate business interest, and that giving individualized consideration to applicants based on factors such as the nature of conviction and evidence of rehabilitation is a less discriminatory alternative that satisfies legitimate interests in protecting safety and property.

38.     Accordingly, on information and belief, the defendants are aware of the disparate and discriminatory impact that their No Felony Conviction policy has on African-Americans, and they are aware of a less-discriminatory approach to screening potential tenants- individual assessment of the potential tenant's criminal history, based on the factors identified above-that would not only protect their safety and property interests but would also comply with the federal Fair Housing Act and  State HUD's Guidelines and with state law.  However, despite this knowledge and awareness, the defendants maintain exactly the type of policy that the HUD Guidance rejects.  The defendants deliberately chose to implement and maintain the more discriminatory method for criminal records screening that automatically excludes a greater number of prospective tenants who are African-American.  One can infer from this that the disparate outcome identified by HUD is exactly the outcome intended by the defendants.

39.     The defendants' choice to maintain the overly broad and discriminatory No Felony Convictions policy also reflects a substantial departure from usual industry practices, which further raises an inference of discriminatory intent.

40.     The defendants' outright rejection of applicants with felony convictions is entirely counter to normal business practices in the apartment industry.  In the normal course of business, landlords and property managers are highly motivated to get people in the door to see their buildings.  Even if someone who visits does not become a tenant, word of mouth is an important

component of apartment marketing, as visitors may tell other about the building.  The defendants'
policy instead assures that a group of people-disproportionately African-American- have no reason
to visit Red Lion Apartments.

41.     The defendants' elevation of criminal history as an absolute bar to residency
without consideration of other eligibility criteria for tenancy is also counter to other normal
business practices in the apartment industry.  In the normal course of business, consideration of
income, prior rental history, credit, and other factors occurs simultaneously during the application
process, and after an application has been submitted and reviewed.

42.     Departures like this from industry norms suggest an illegal motive.

43.     In light of these facts, there is no non-discriminatory explanation for why the
defendants deliberately chose and continue to implement the No Felony Conviction policy over an
individualized screening practice.  Rather, these facts collectively support the inference-indeed,
they strongly suggest-that the defendants fully understand the unnecessary and unlawful disparate
impact of their No Felony Convictions policy on African-Americans, and that they created their
policy precisely because of its discriminatory impact.  The No Felony Conviction policy is a tool
that defendants intentionally use to minimize the number of African-Americans residing in their
apartment complex in violation of the federal Fair Housing Act and state law.

44.     As a result of the defendants' action described above, the plaintiff has been directly
and substantially injured.   The plaintiff has been frustrated in its mission to eradicate
discrimination in housing and in carrying out the programs and services it provides, including
encouraging integrated living patterns, eliminating unlawful barriers in housing, and educating the
public about fair housing rights and requirements.

45.     Since becoming increasingly aware of the effects of overbroad and punitive criminal records screening policies, including the exclusion of applicants with criminal records without individualized consideration, as well as the disparate impact such policies have on minority applicants, the plaintiff has invested considerable time and effort in educating the community about the importance of accessible housing for people with criminal records.  As a result of discovering the defendants' policy, the plaintiff has directed much of its education and counseling efforts to rebutting the impression that automatic criminal history bans like the defendants, are permissible.

46.     Because the defendants' No Felony Conviction policy has had and continues to have the effect of banning people with felony records, who are disproportionately African-American, from living at Red Lion Apartments, the defendants' conduct frustrates the plaintiff's mission of ensuring equal housing opportunity for all individuals, free of arbitrary barriers.

47.     The plaintiff has been damaged by having to divert scarce resources that could have been used to provide the aforementioned services to instead identify, investigate, and counteract the defendants' discriminatory conduct.

48.     Specifically, the plaintiff's staff has expended a significant number of hours investigating the defendants' unlawful policy and practice.

49.     In addition, the plaintiff has diverted time and money to education and outreach efforts directly and specifically aimed at countering the defendants' discrimination.  After encountering the defendants' blatantly discriminatory practices in 2018, plaintiff has engaged in community education programs to counteract them.  For example, the plaintiff (a) added content to its education presentations about discriminatory criminal records screening polices; (b) designed a social media effort, including significant advertisement on Facebook, about the discriminatory

impact of criminal records screening policies to educate; and (c) engaged in community events to help educate individuals with criminal records who have encountered automatic criminal history bans in the housing bans in the housing market.

50. The plaintiff engaged in each of the aforementioned activities in specific response to the defendants' practices because they were significantly more egregious and exclusionary that the practices of other housing providers. These activities have caused the plaintiff's staff to expend a significant amount of time and money.

51. But for the need to address the defendants' practices, the plaintiff would have directed theses resources to other efforts to further its mission. Specifically, the time and resources would have been allocated towards its programs aimed at encouraging integrated living patterns, eliminating unlawful barriers in housing, educating the public about fair housing rights and requirements, and providing assistance to individuals and families looking for housing or affected by other discriminatory housing practices. The plaintiff's ability to direct resources to these efforts has been and continues to be reduced because of the need to divert resources to addressing and counteract the defendants' discriminatory No Felony Conviction policy.

52. Until redressed and permanently ceased, the defendants' unlawful, discriminatory actions will continue to injure the plaintiff, for example, by:

    a. interfering with efforts and programs intended to bring about equality of opportunity in housing;

    b. requiring the commitment of scarce resources, including substantial staff time and funding, to investigate and counteract defendants' discriminatory conduct, thus diverting those resources from the plaintiff's other activities and services, such as education, outreach, and counseling; and

    c.      frustrating the plaintiff's mission and purpose of promoting the equal availability of housing to all persons without regard to their membership in any protected category, including race.

53.    The defendants' discriminatory conduct, if continued, will also deprive individuals to whom the plaintiff provides services and other living in and near Red Lion Apartments of the benefit of living in a diverse community.

54.    The defendants' unlawful actions described herein were, and are, intentional, willful, and malicious, and/or have been, and are, implemented with callous and reckless disregard for rights protected under federal and state law.

## Count I:

## Disparate Impact in Violation of the Fair Housing Act, 42 U.S.C. § 3604

55.    The plaintiff repeats and incorporates by reference all allegations set forth in Paragraphs 1-54 above.

56.    The defendants' acts, policies, and practices have an adverse and disproportionate impact on African-Americans.  This adverse and disproportionate impact is the direct result of the defendants' No Felony Convictions policy that automatically denies housing for people with felony records without considering the applicant's individual characteristics and circumstances.

57.    The defendants' No Felony Conviction policy was not and is not necessary to serve any substantial, legitimate, nondiscriminatory interest, and any such interest could be satisfied by another practice – providing individualized consideration-that would have a less discriminatory effect.

58.    The defendants' acts, policies, and practices constitute discrimination and violate the Fair Housing Act, as amended, 42 U.S.C. § 3604, and implementing regulations, in that:

a.    The defendants' acts, policies, and practices constitute a refusal to rent housing or negotiate for the rental of housing because of race, and have made housing unavailable because of race, in violation of 42 U.S.C. § 3604(a);

b.    The defendants' acts, policies, and practices provide different terms, conditions, and privileges of rental housing, as well as different services and facilities in connection therewith, on the basis of race, in violation of 42 U.S.C. § 3604(b); and

c.    The defendants' notices and statements indicate a preference, limitation, and discrimination based on race in violation of 42 U.S.C. § 3604(c).  The defendants' statement in their No Felony Conviction policy that excludes any person from renting an apartment at Red Lion Apartments because of any felony or felonies has a discriminatory effect on African-Americans because they actually or predictably result in a disparate impact on the basis of race.


**Count II:**

**Intentional Discrimination in Violation of the Fair Housing Act 42 U.S.C. § 3604**

59.    The plaintiff repeats and incorporates by reference all allegations set forth in Paragraphs 1 through 58 above.

60.     The defendants' acts, policies, and practices have been carried out with the intention of discriminating on the basis of race.

61.     On information and belief, the defendants are aware of the disparate impact that their No Felony Convictions policy has on African-Americans.  They are also aware of HUD's April 2016 Guidance regarding criminal records-based screening policies, including its repudiation of automatic blanket bans and its instructions to adopt less discriminatory approaches to screening, such as individual assessments of criminal histories, that would adequately protect public safety and property concerns.

62.     However, despite this knowledge and awareness, the defendants departed from industry practices and deliberately chose and continue to implement their more discriminatory method for screening on the basis of criminal history.  Under theses facts, no legitimate, non-discriminatory explanation exists for the defendants' choice in adopting and maintaining the more discriminatory and exclusionary policy.  The defendants selected the No Felony Conviction policy with the intent and expectation that the policy would disproportionately prevent African-Americans from obtaining housing at Red Lion Apartments.

63.     The defendants' acts, policies, and practices constitute intentional discrimination and violate the Fair Housing Act, as amended, 42 U.S.C. § 3604, and its implementing regulations, in that.

            a.     The defendants' acts, policies, and practices constitute a refusal to rent housing or negotiate for the rental of housing because of race, and have made housing unavailable because of race, in violation of 42 U.S.C. § 3604(a).

b.    The defendants' acts, policies, and practices provide different terms, conditions, and privileges of rental housing, as well as different services and facilities in connection therewith, on the basis of race, in violation of 442 U.S.C. § 3604(b); and

c.    The defendants' notices and statements indicate a preference, limitation, and discrimination based on race in violation of 42 U.S.C. § 3604(c).

### Count III:

### Disparate Impact in Violation of the Elliott-Larson Civil Rights Act, MCL 37.2502

64.    The plaintiff repeats and incorporates by reference all allegations set forth in Paragraphs 1 through 63 above.

65.    The defendants' acts, policies, and practices have an adverse and disproportionate impact on African-Americans.  This adverse and disproportionate impact is the direct result of the defendants' No Felony Convictions policy, pursuant to which it automatically refuses housing  to people with a felony conviction with no consideration of their individual characteristics and circumstances.

66.    The defendants' No Felony Conviction policy was not and is not necessary to serve any substantial, legitimate, nondiscriminatory alleged interest, and any such interest could be satisfied by another practice-providing individualized consideration-that would have a less discriminatory effect.

67.    The defendants' acts, policies, and practices constitute discrimination and violate the Elliot-Larson Civil Rights Act, MCL 37.2502, and its implementing regulations, in that:

a.  The defendants' acts, policies, and practices constitute a refusal to rent housing or negotiate for the rental of housing because of race, and have made housing unavailable because of race, in violation of MCL 37.2502 (1)(a), (c), and (d).

b.  The defendants' acts, policies, and practices provide different terms, conditions, and privileges of rental housing, as well as different services and facilities in connection therewith, on the basis of race in violation of MCL 37.2502(1)(b).

c.  The defendants' notices and statements indicate a preference, limitation, and discrimination based on race in violation of MCL 37.2502.  The defendants' statement in their No Felony Convictions policy that excludes any person from renting an apartment at Red Lion Apartments because of criminal history has a discriminatory effect on African-Americans because they actually or predictably result in a disparate impact on the basis of race.

**Count IV:**

**Intentional Discrimination in Violation the Elliott-Larson Civil Rights Act, MCL 37.2502**

68.  The plaintiff repeats and incorporates by reference all allegations set forth in Paragraphs 1 through 67 above.

69.  The defendants' acts, policies, and practices are carried out with the intention of discriminating on the basis of race.

70.  On information and belief, the defendants are aware of the disparate impact that their No Felony Conviction policy has on African-Americans.  They are also aware of HUD's

April 2016 Guidance regarding criminal records-based screening policies, including its repudiation of automatic blanket bans and its instructions to adopt less discriminatory approaches to screening, such as individual assessments of criminal histories, that would adequately protect public safety and property concerns.

71.     However, despite this knowledge and awareness, the defendants departed from industry practices and deliberately chose and continue to implement their more discriminatory method of screening on the basis of criminal history.  Under these facts, no legitimate, non-discriminatory explanation exists for the defendants' choice in adopting and maintaining the more discriminatory and exclusionary policy.  The defendants selected the No Felony Conviction policy with the intent and expectation that the policy would disproportionately prevent African-Americans from obtaining housing at Red Lion Apartments.

72.     The defendants' acts, policies and practices constitute intentional discrimination and violate the Elliot-Larson Civil Rights Act, and its implementing regulations, in that:

a.      The defendants' acts, policies, and practices constitute a refusal to rent housing or negotiate for the rental of housing because of race, and have made housing unavailable because of race, in violation of MCL 37.2502

b.      The defendants' acts, policies, and practices provide different terms, conditions, and privileges of rental housing, as well as different services and facilities in connection therewith, on the basis of race, in violation of MCL 37.2502.

c.      The defendants' notices and statements indicate a preference, limitation, and discrimination based on race, in violation of MCL 37.2502.

**REQUESTED RELIEF**

The plaintiff respectfully asks that this Court grant it the following relief:

(1)    Enter a declaratory judgment finding that the foregoing actions of defendants violate 42 U.S.C. § 3604 and MCL 37.2502;

(2)    Enter a permanent injunction:

    a)    enjoining the defendants and their directors, officers, agents, and employees from publishing, implementing, and enforcing the illegal discriminatory conduct described herein;

    b)    directing the defendants and their directors, officers, agents and employees to eliminate their No Felony Conviction policy, to reduce the adverse and disproportionate effect it causes on the basis of race and make it consistent with the federal Fair Housing Act, the HUD Guidance, and MCL 37.2502.

    c)    directing the defendants and their directors, officers, agents, and employees to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and prevent additional instances of such conduct or similar conduct from occurring in the future;

(3)    Award compensatory damages to the plaintiff in an amount to be determined by the jury that would fully compensate the plaintiff for injuries caused by the conduct of the defendants alleged herein;

(4)    Award punitive damages to the plaintiff in the amount to be determined by the jury that would punish the defendants for the willful, malicious, and

reckless conduct alleged herein and that would effectively deter similar

conduct in the future;

(5)     Award the plaintiff its reasonable attorney's fees and costs under 42 U.S.C.

§ 3613(c)(2) and MCL 37.2502.

(6)     Award prejudgment interest to the plaintiff; and

(7)     Order such other relief as this Court deems just and equitable.


Dated: February 26, 2020                WILLIAM F. PIPER, PLC.
                                        Attorney for Plaintiff

                          By:     /s/ William F. Piper
                                  William F. Piper (P38636)
                          ADDRESS:  1611 W. Centre Ave., Ste. 209
                                  Portage, MI 49024
                                  (269) 321-5008